J-S14041-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: M.A.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 41 MDA 2021 |

Appeal from the Decree Entered November 24, 2020
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s):  2020-00149

BEFORE:  BOWES, J., DUBOW, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                **FILED JULY 27, 2021**

A.D. ("Father") appeals from the Decree granting the Petition filed by the Lancaster County Children and Youth Social Service Agency ("Agency") to involuntarily terminate his parental rights to his dependent child, M.A.M. ("Child") (a female born in June 2018), pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b).[1]  We affirm.

In its Opinion, the trial court set forth the procedural background from the juvenile court proceedings, which we adopt as if set forth fully herein.  ***See*** Trial Court Opinion, 1/22/21, at 1-3.  Briefly, Child was born in June 2018, and the Agency filed a Petition for temporary custody on July 2, 2018.  Father's

---

[1] In a separate Decree, entered on the same day, the trial court involuntarily terminated the parental rights of Child's mother, Y.-W.A.M., ("Mother") to the Child.  Mother has not filed a brief in Father's appeal, nor has she filed an appeal from the Decree terminating her parental rights.

status as Child's biological father was unknown at the time. Mother did not contest the factual basis for Child's dependency. Child was ultimately declared dependent in August 2018, and a permanency plan was put in place.

Father was identified as Child's Father in September 2018. In December 2018, the court approved a revised child permanency plan, which included objectives for Father. At the time, Father resided in Georgia. In May 2019, a Recommendation – Permanency Review Order noted minimal compliance by Father with Child's permanency plan and stated that Father had made no progress towards eliminating the circumstances that necessitated Child's placement. A subsequent Recommendation – Permanency Review Order found moderate compliance with the permanency plan and moderate progress in alleviating the circumstances that led to Child's Placement on Father's part. Father was still living in Georgia at the time. An Interstate Compact on the Placement of Children[2] ("ICPC") request was in progress at the time for the

---

[2] An ICPC has been described as follows:

> As drafted, the [ICPC] provides for notification of appropriate state or local authorities in the receiving state before placement by out-of-state persons and agencies. The authorities in the receiving state are given the opportunity to investigate, and if satisfied, must notify the sending state that the proposed placement does not appear to be contrary to the child's interest. After a placement has been made, the sending state continues to have financial responsibility for support and retains jurisdiction over the child.

***McComb v. Wambaugh***, 934 F.2d 474, 480 (3d Cir. 1991); ***see also*** 62 P.S. § 761; 55 Pa. Code § 3130.41.

child welfare agency in Georgia to assess Father's home.[3] Father moved back to Pennsylvania in January 2020. A third Recommendation – Permanency Review Order was issued in June 2020, which found minimal compliance by Father and minimal progress in alleviating the circumstances that led to Child's placement.

On January 22, 2020, the Agency filed a Petition to terminate Father's parental rights based on 23 Pa.C.S.A. § 2511(a)(1), (2), and (b). On February 10, 2020, Agency caseworker Ludie Louis Juste ("Ms. Juste") served Father with the Petition. On August 20, 2020, the trial court held an evidentiary hearing on the termination Petition. The Agency's counsel, Tamara Hogan, Esq., was present, as were Father and his counsel, Catherine Roland, Esq. ("Attorney Roland"), and Gina Carnes, Esq., who served as both guardian *ad litem* and legal interest counsel ("GAL/legal interest counsel") for Child. Allison Wright, Esq. ("Attorney Wright"), represented Mother, who was not present. Attorney Wright requested to withdraw as Mother's counsel, which the trial court granted. N.T., 8/20/20, at 4.

The Agency first presented the testimony of Bobbi Leiphart ("Officer Leiphart"), an adult probation officer for York County who supervised Father between March 10, 2020, when Father was charged with a second driving under the influence ("DUI") offense, until August 20, 2020, when Father was sentenced for the DUI offense. *Id.* at 5-6. Officer Leiphart testified that

---

[3] A total of three ICPC approval requests were submitted in this matter.

Father was sentenced to five years' probation, followed by 135 days on house arrest, and a $1,500 fine. *Id.* at 6. She further testified that Father had been wearing a SCRAM continuous alcohol monitoring bracelet, which is a device worn on an individual's wrist that senses the person's alcohol intake through means of a thermal detection in the skin, since he was released on bail in March 2020. *Id.* Next, the Agency presented the testimony of Ms. Juste, who was assigned to Child's case. *Id.* at 9. Father then testified on his own behalf. *Id.* at 47. The trial court continued the hearing to September 17, 2020.

At the hearing on September 17, 2020, Mother was not present. Attorney Roland continued her direct examination of Father. N.T., 9/17/20, at 4. Subsequently, counsel for the Agency conducted cross-examination of Father, as did the GAL/legal interest counsel. *Id.* at 9, 27. Attorney Rolland then questioned Father on re-direct examination. *Id.* at 31.

The trial court ably set forth the factual history and made findings of fact based upon the testimonial and documentary evidence at the dependency/permanency review hearings and the termination hearings, which it found credible. *See* Trial Court Opinion, 1/22/21, at 5-12. We adopt those findings as though they were fully set forth herein. *See id.* We provide the following summary of the trial court's findings of fact.

Father was identified as the Child's biological father in September 2018 and was living in Georgia at that time. The first ICPC was denied because Mother was living with Father and one of Father's sons; the second ICPC was rejected because Father had moved after the ICPC was requested; and the

third ICPC was denied due to the high level of alcohol in Father's system. Father completed a drug and alcohol evaluation in Georgia in September 2019, and it was recommended that Father attend outpatient substance abuse treatment. Father informed the Agency that he was told he did not need services. When the Agency received a copy of the evaluation, the recommendation for treatment had been erased by the provider.

Father was charged with DUI in 2010. Father was charged with a second DUI on February 2, 2020. Father remains in denial about his issues with alcohol. Father underwent a second drug and alcohol evaluation in May 2020, and the report recommended outpatient drug and alcohol treatment and recommendations for group and individual therapy. Father failed to provide requested drug screens on three occasions and tested positive for marijuana on four occasions.

Father had three visits with Child in 2019. Father had four visits with Child in 2020, before the COVID-19 pandemic forced in-person visits to cease. Father did not have any virtual visits with Child during the COVID-19 shutdown, which extended through June 2020. In-person visits resumed on June 30, 2020.

Father has a total of seven children. He has had varying levels of involvement in their respective lives, ranging from living with Father on and off throughout the child's life to having little contact with Father, depending on the status of Father's relationship with each child's mother.

Finally, Child has resided in the same home since birth, and the home is a potentially permanent home for Child. There are two other children in the home, which Child interacts with as siblings. Child looks to the resource parents for comfort, nurturing, and parenting and refers to them as "mommy and daddy."

Following the August 2020 hearing, the trial court involuntarily terminated Father's parental rights, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b). Father timely filed a Notice of Appeal and complied with Pa.R.A.P. 1925.

In his brief on appeal, Father raises four issues, as follows:

I. Did the trial court err and abuse its discretion in finding that the Agency proved by clear and convincing evidence under 23 Pa.C.S.[A. §] 2511(a)(1) that Father evidenced a settled purpose of relinquishing his parental claim to [Child] or refused or failed to perform his parental duties for a period of six (6) months immediately preceding the filing of the Petition[,] where Father at all times desired to exercise his parental claim to [Child] and was not provided the opportunity to perform his parental duties?

II. Did the trial court err and abuse its discretion in finding that the Agency proved by clear and convincing evidence under 23 Pa.C.S.[A. §] 2511(a)(2) that Father's repeated and continued incapacity caused the Child to be without essential parental care, control or subsistence necessary for the Child's physical and mental wellbeing[,] when Father was never provided the opportunity to show the Agency that he did not have an incapacity and that he could provide essential parental care, control and subsistence necessary for the [Child's] physical and mental well-being?

III. Did the trial court err and abuse its discretion in finding that the Agency proved by clear and convincing evidence under 23 Pa.C.S.[A. §] 2511(b) that it is in the Child's best interest to terminate Father's parental rights?

IV. Was Father denied his Fourteenth Amendment Rights to not be deprived of life, liberty, or property without due process of law; nor to be denied the equal protections of law?

Father's Brief at 3-4.[4]

In reviewing an appeal from a decree terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, [] 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) [(plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, … 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court

---

[4] In the Statement of Questions Involved, Father included a fifth issue challenging whether he was denied his right to competent representation by legal counsel, but Father withdrew that issue. *See* Father's Brief at 4.

and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. **In re Adoption of Atencio**, 650 A.2d 1064, 1066 ([Pa.] 1994).

**In re Adoption of S.P.**, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. **In re R.N.J.**, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, as we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" **Id.** (quoting **In re J.L.C.**, 837 A.2d 1247, 1251 (Pa. Super. 2003)). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

We will address subsections 2511(a)(1), (2) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of

- 8 -

relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (b).

With respect to subsection 2511(a)(1), our Supreme Court has held as

follows:

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1988).

Further, this Court has stated that

the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and

- 9 -

consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 854-55 (Pa. Super. 2004) (citations omitted).

In *Adoption of S.P.*, our Supreme Court reiterated the standard with which a parent must comply in order to avoid a finding that he abandoned his child. A parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." *Adoption of S.P.*, 47 A.3d at 828 (quotation omitted). "Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited." *Id.*

In his first claim, regarding 23 Pa.C.S.A. § 2511(a)(1), Father argues that the trial court erred in failing to examine the totality of the circumstances of the case and to consider his explanations regarding his efforts to parent Child. Father's Brief at 11. Father argues that there were significant delays in this case, such that the court's focus should not have been on the six-month period prior to the filing of the termination Petition on January 22, 2020, *i.e.*, July 22, 2019. *Id.* at 12. Father states that he took immediate steps to parent Child after learning that he was Child's father, but his efforts had already been significantly delayed by the Agency's slowness to identify him and the significant delays in the ICPC process. *Id.* He claims that the record indicates that the Agency did little, or nothing, to move the process along. *Id.* at 13.

Specifically, Father asserts that during the six-month period, he was working on the child permanency plan and waiting for the ICPC investigations to be completed. *Id.* at 12. Father asserts that his second ICPC investigation request was rejected on August 30, 2018 because he had moved after the request was made. *Id.* Father complains that he had made the Agency caseworker aware of his change in address, and the caseworker failed to notify the Georgia agency. *Id.* Father contends that it was the Agency's duty to report his address change to the Georgia agency, but the Agency failed to do so. *Id.* Father posits that his request might have been granted but for the Agency's failure to inform the Georgia agency that he had moved. *Id.* Father argues that this delay and subsequent denial of his ICPC request should not be held against him, as the Agency is statutorily required to assist parents in gaining the return of their children. *Id.* Additionally, Father contends that, because he was committed to obtaining custody of Child, he requested a third ICPC investigation. *Id.* Father complains that his third request was denied because he tested positive for alcohol on the day when the Georgia caseworker came to assess his home in August 2020. *Id.*

Father also contends that the trial court erred in concluding that he evidenced a settled purpose of relinquishing his parental rights despite his sincere efforts to parent Child. *Id.* at 13. Father asserts that the evidence that he did not have a settled purpose of relinquishing his parental rights to Child include that he moved to York, Pennsylvania, to be near Child; he

immediately secured employment and housing; and he visited with Child and maintained regular contact with the resource parents through Zoom and e-mail. *Id.* Father states that, in addition to Child, he has six other children, and he has taken responsibility for all of them. *Id.* Father states that most of his other six children have lived with him for periods of time, and that two are in college, for whom he continues to take responsibility. *Id.* Moreover, Father avers that his rights to his other children have not been terminated. *Id.*

The trial court addressed Father's issue regarding section 2511(a)(1) as follows:

> There are two pathways to the establishment of the Agency's case under this subsection of the statute. The statute requires the Agency to prove that during a period of more than six months prior to the filing of the Agency's termination of parental rights petition Father demonstrated *EITHER* a settled purpose or intent to relinquish a parental claim *OR* a failure to perform parental duties.
>
> In the instant case, the record supports this court's finding of facts sufficient to determine that Father, by his inaction, followed the second of these pathways to the inescapable conclusion that Father's parental rights should be terminated.
>
> Father learned that he was a parent to [Child] in the summer of 2018. (Finding of Fact 10.) That condition was conclusively proven through paternity testing, the results, of which were known on September 12, 2018. (Finding of Fact 11.)
>
> Measured from the date that Father knew unquestionably that he was a parent to [Child,] to the date that the Agency's [P]etition was filed (January 22, 2020), a period of more than fifteen months elapsed during which Father did not perform any parental duties toward [Child].

> Father was granted [the] Child's [p]ermanency [p]lan at the permanency review hearing held before a master on December 19, 2018. Measured from that date, more than a year elapsed during which Father did very little to address the objectives of his plan.
>
> As th[is] Court has explained: "There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of a child. Thus, [the Superior Court] has held that the parental obligation is a positive duty, which requires affirmative performance. … Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life." *In re B., N.M.*, 856 A.2d [at 855][.]
>
> For a period of six months preceding the filing of the Agency's [P]etition to terminate parental rights, Father took no affirmative steps to perform parental duties. He made no effort to maintain the parent-child relationship. "Although the six-month period immediately preceding the filing of the petition is most critical to the analysis, the court must consider the whole history of the case and not mechanically apply the six-month statutory provision." *In re K.Z.S.*, 942 A.2d 753, 758 (Pa. Super. 2008)[.] Father took no steps to be a parent from the summer of 2018 and those efforts were spotty at best. Grounds for the termination of Father's parental rights under [section] 2511(a)(1) have been proven by clear and convincing evidence.

Trial Court Opinion, 1/22/21, at 15-17 (emphasis in original).

The trial court's determination that Petitioners satisfied the requirements of section 2511(a)(1) is supported by competent, clear and convincing evidence in the record. *In re Adoption of S.P.*, 47 A.3d at 826-27; *In re: T.S.M.*, 71 A.3d at 267. We adopt the discussion set forth in the trial court Opinion. *See* Trial Court Opinion, 1/22/21, at 15-17.

In his second claim, regarding section 2511(a)(2), Father argues that Child was placed in the Agency's custody because Mother could not care for her. Father's Brief at 14-15. Father asserts that the record indicates that he had housing and income throughout the case; he has six other children and has had a parental role in their lives; he co-parented with the mothers of his other children; and, upon learning about Child's existence, he took immediate steps to unify and be a parent to her. *Id.* at 15. Father states that these facts contradict the Agency's argument that Father is incapable of parenting Child. *Id.* Father contends that there were delays in his being able to parent Child, attributing some of the delays to the Agency's failure to move the case along, some to the COVID-19 pandemic, and some to his own conduct. *Id.* Father claims, however, that the record does not show he has a lack of parental capacity, or that he cannot or will not meet Child's needs. *Id.*

To satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are

not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. ***In re A.L.D.*** 797 A.2d 326, 337 (Pa. Super. 2002).

The trial court addressed Father's second issue, regarding 23 Pa.C.S.A. § 2511(a)(2), as follows:

> The Agency has the burden to prove three elements under this subsection of the statute: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for [her] physical or mental well-being; and (3) the cause of the incapacity, abuse, neglect or refusal cannot or will not be remedied. ***In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted).
>
> Under [section] 2511(a)(2)[,] the focus is on the child's present and future need for essential parental care, control, or subsistence necessary for [her] physical or mental well-being. ***In re E.A.P.***, 944 A.2d 79, 82 (Pa. Super. 2008) (citations omitted and internal quotations omitted).
>
> In the present case, Father never has had physical custody of [Child]. He has done little to assert that he was a willing and able parent from the inception of the case. Father has never provided any care for [Child]. He has not demonstrated the parental care necessary for [Child's] physical and mental wellbeing to flourish. By his own history of his parenting of his other children as he related it, Father is an "on and off" parent. Father's history gives rise to concerns that he would ever be capable of providing for [Child's] future needs for essential parental care, control, or subsistence. He only recently began to address the objectives contained in [Child]'s Permanency Plan, despite the fact that the plan was in place since December 19, 2018. Father's only measurable efforts toward his objectives took place after Father was served with the Agency's [P]etition to terminate his parental rights to [Child]. Father's efforts are indubitably too little and too late.

Trial Court Opinion, 1/22/21, at 17-18.

The trial court's determination that Petitioners satisfied the requirements of section 2511(a)(2) is supported by competent, clear and convincing evidence in the record. *In re Adoption of S.P.*, 47 A.3d at 826-27; *In re: T.S.M.*, 71 A.3d at 267. We adopt the discussion set forth in the trial court Opinion. *See* Trial Court Opinion, 1/22/21, at 17-18.

In his third claim, regarding section 2511(b), Father argues that the trial court erred in concluding that the Agency proved, by clear and convincing evidence, that there is no bond between Child and him. Father's Brief at 15. Father asserts that a bond exists between Child and him, and that Ms. Juste testified that Child smiles and laughs with Father at visits. *Id.* at 16. Additionally, Father argues that there were delays that negatively impacted his access to Child, including the delay in formally identifying him as Child's father, the lengthy ICPC process, and the distance between his home and Child's placement until Father relocated to York, Pennsylvania. *Id.* Father urges that the COVID-19 pandemic also restricted his in-person visits with Child, since virtual visits were necessary for safety of all involved, but they impacted his ability to strengthen his bond with Child. *Id.* Father also complains that there was no testimony, other than that of Ms. Juste that Child would suffer from being placed in Father's care. *Id.*

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super.

2008) (*en banc*).  In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child."  23 Pa.C.S.[A.] § 2511(b).  The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability."  *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012).  In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child.  The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.  *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d at 267.  When evaluating a parental bond, "the court is not required to use expert testimony.  Social workers and caseworkers can offer evaluations as well.  Additionally, section 2511(b) does not require a formal bonding evaluation."  *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted).

A parent's abuse and neglect are likewise a relevant part of this analysis:

> concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound.  If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. … Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists.  The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

- 17 -

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted); *see also In re K.Z.S.*, 946 A.2d at 763-64 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d at 856 (internal citations omitted).

This Court has explained that a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008)).

The trial court addressed Father's issue regarding 23 Pa.C.S.A. § 2511(b) as follows:

> The court must next determine whether terminating Father's parental rights to [Child] will best serve the developmental, physical and emotional needs and welfare of [Child]. *See*[] 23 Pa.C.S.A. § 2511(b). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re G.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005)[.] An examination of the parent-child bond is required, where the court must assess the effect upon the child of severing that bond. Expert testimony is not required. *See In re K.K.R.-S.*, 958 A.2d [at] 533 ….

[Child], who was born [in June 2018], is now more than two[-]and[-a-]half years of age. Father is, for all purposes, a stranger to her. Father's lack of interest was amply demonstrated by his minimal efforts to maintain contact with [Child] long before the COVID-19 pandemic disrupted in-person visitation. Under these circumstances, it is fully evident that [Child] has no bond with Father at all which would be severed by the termination of Father's parental rights.

[Child] deserves permanency. [Child] deserves a nurturing, loving, and stable home. [Child] presently enjoys a home possessing these characteristics with the resource family, which is a potentially permanent resource for her[,] and which is the only family [Child] has ever known. There is no doubt that [Child]'s removal from this home would be highly traumatic and damaging to her psychological and emotional health.

In summary, [Child]'s best interests are served if she remains with her resource family and is freed to be adopted into that family.

Trial Court Opinion, 1/22/21, at 18-19.

The trial court's determination that Petitioners satisfied the requirements of section 2511(b) is supported by competent evidence in the record. *In re Adoption of S.P.*, 47 A.3d at 826-27; *In re: T.S.M.*, 71 A.3d at 267. We adopt the discussion set forth in the trial court Opinion with regard to Father's third issue. *See* Trial Court Opinion, 1/22/21, at 18-19.

In support of his fourth issue, Father argues that the termination of his parental rights under section 2511(a) and (b) was not supported by clear and convincing evidence, such that the trial court deprived him of his constitutional due process right to parent Child, despite his efforts to parent her and the significant delays in the reunification process. Father's Brief at 10, 16-17.

As we have determined that there was clear and convincing evidence to support the termination of Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b), the trial court did not deny Father's constitutional right to raise Child. We find that his constitutional argument lacks merit.

Accordingly, as we find that the trial court did not commit an error of law or an abuse of discretion in terminating Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b), we affirm the trial court Decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/27/2021

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

IN RE:

    M.    .A.    M         :      No. 149 of 2020

                              :      INVOLUNTARY TERMINATION

## OPINION *SUR* APPEAL

This opinion is written in response to an appeal from this court's Decree which involuntarily terminated the parental rights of A    D    as birth father (hereinafter, "Father") of M    .A    M    (who is referred to hereinafter as the "Child").

## PROCEDURAL HISTORY OF THE JUVENILE DEPENDENCY CASE

The Child was born on June    2018. The Lancaster County Children and Youth Social Service Agency (hereinafter, the "Agency") filed a Petition for Temporary Custody of the Child on July 2, 2018. The petition alleged the Child is a dependent child pursuant to 42 Pa. C.S. § 6302, in that the Child:

> is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his/her physical, mental, or emotional health, or morals; a determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk.[1]

---

[1] Agency's petition, page 4.

A Shelter Care Order was issued on July 5, 2018, which granted temporary custody of the Child to the Agency. Mother appeared at the hearing and waived the shelter care hearing without admission of any of the allegations in the petition for custody. Father's status as the Child's biological father was unknown at that time.

The court issued an Order of Adjudication and Disposition on August 2, 2018, in which the Child was found to be a dependent child, based in part upon Mother's acknowledgment of the factual accuracy of the allegations of dependency in the Agency's petition. In respect to disposition, the court approved a Child's Permanency Plan with a primary permanency goal of reunification with a parent and a concurrent permanency goal of adoption. The biological father of the Child still had not been identified as of that time.

A Recommendation - Permanency Review Order was issued on December 19, 2018, which approved a revised Child's Permanency Plan including objectives for Father. Given the fact that the Child's Permanency Plan was just approved, the master found no compliance by Father with the plan. Father had only recently been identified and at that time Father resided in Georgia. The juvenile hearing officer also found no progress by Father in respect to the alleviation of the circumstances which led to the Child's placement.

-2-

A subsequent Recommendation – Permanency Review Order was issued on May 22, 2019, which found minimal compliance by Father in respect to the Child's Permanency Plan. The order also stated that Father had made no progress toward alleviating the circumstances that necessitated the Child's placement.

A Recommendation – Permanency Review Order was issued on October 18, 2019, which found moderate compliance by Father (who continued to reside in Georgia) with the Child's Permanency Plan. An Interstate Compact on the Placement of Children (hereinafter, "ICPC") request was in process at that time for the child welfare agency in Georgia to assess Father's home. The hearing officer found that Father had made moderate progress toward alleviating the circumstances that necessitated placement.

A Recommendation – Permanency Review Order was issued on June 26, 2020, which found minimal compliance by Father with the Child's Permanency Plan. The Order noted that Father had moved back to Pennsylvania in January 2020. The juvenile hearing officer further found that Father had achieved minimal progress in alleviating the circumstances which necessitated the original placement.

## PROCEDURAL HISTORY OF THE TERMINATION OF PARENTAL RIGHTS CASE

The Agency filed a Petition to Terminate Parental Rights on January 22, 2020.

In its Petition to Terminate Parental Rights, the Agency alleged as the basis for the termination of Father's rights that:

A. Father, by conduct continuing for a period of at least six months immediately preceding the filing of the petition, either has evidenced a settled purpose of relinquishing parental claim to said child or have refused or failed to perform parental duties. (Section 2511 (a)(1))

B. The repeated and continued incapacity, abuse, neglect, or refusal of Father has caused the child to be without essential parental care, control, or subsistence necessary for her physical and mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by said parents. (Section 2511 (a)(2))

Father was personally served with the petition by Agency caseworker Ludie Louis Juste on February 10, 2020.

The court held hearings on the Agency's termination of parental rights petition on August 20, 2020, and on September 17, 2020.

As the record of the juvenile proceedings was incorporated into the record of the termination of parental rights proceedings, it was necessary to obtain and review the record of all of the juvenile proceedings before the court could issue a decree. That process was completed and a Decree was signed on November 17, 2020, and filed November 24, 2020, which

-4-

involuntarily terminated Father's parental rights. Mother's parental rights were terminated on this same date.

Father filed a Notice of Appeal on December 15, 2020. Father's appeal was timely filed. Mother did not file an appeal.

## FINDINGS OF FACT

1. The Child was born June    2018. (N.T. 08/20/2020 at page 9)

2. The Agency believed the Child to be dependent due to concerns with Mother's mental health. (N.T. 8/2/2018 at page 3)

3. At the time of placement, Mother was residing at the Valley Youth House in Allentown, where she was able to live with the Child. (N.T. 8/2/2018 at page 2)

4. Mother was twenty years of age at the time of the Child's placement. (N.T. 8/2/2018 at page 3)

5. Mother had herself been in the care of the Agency as a child. Mother left care when she was 19 years of age. (N.T. 8/20/2020 at page 10)

6. Mother came back into care because she was pregnant and homeless. (N.T. 8/20/2020 at page 10)

7. At the time of the Child's birth, Mother told the hospital she could not care for the Child. (N.T. 8/20/2020 at page 10)

-5-

8. At the shelter care hearing, Mother stated that the father is A____ D____ and that Father lives in Atlanta, Georgia. (N.T. 7/5/2018 at page 9)

9. Father met Mother on an internet website. At the time that Father and Mother met, he was 40 years old and Mother was 19 or 20 years old. (N.T. 9/17/2020 at page 16)

10. Father was informed that he is the father of the Child in the summer of 2018. (N.T. 9/17/2020 at page 24)

11. A paternity test was completed on August 28, 2018. On September 12, 2018, Father was identified as the biological father of the Child. (N.T. 8/20/2020 at page 11)

12. When the paternity testing was conducted and established the identity of the biological father, Father was living in Georgia. (N.T. 8/20/2020 at page 11)

13. The first ICPC approval request was rejected by the state of Georgia because Father was then living with Mother and Father's 16 year old son. Father believed it would look better if Father and Mother were living together to have the Child returned to him. (N.T. 5/22/2019 at page 7, 8/20/2020 at page 12 and page 57, and 9/17/2020 at page 20)

14. On August 30, 2018, the second ICPC was rejected by Georgia because Father had moved after the ICPC was requested. (N.T. 8/20/2020 at pages 12, 45 and 58)

-6-

15. On September 13, 2019, the third ICPC was rejected by Georgia because of the level of alcohol in Father's system. Father's home was deemed not safe. (N.T. 8/20/2020 at page 12, page 46, and pages 58-59; Petitioner's Exhibit 3 of 8/20/2020)

16. Father moved from Georgia to York, Pennsylvania, in January 2020. (N.T. 8/20/2020 at page 20)

17. Father was first charged with Driving Under the Influence of Alcohol ("DUI") on February 26, 2010, when he was twenty-three years old. (N.T. 8/20/2020 at page 50)

18. Father completed a drug and alcohol evaluation in Georgia on September 3, 2019. (N.T. 8/20/2020 at page 24)

19. When Father reported that he completed the evaluation on September 16, 2019, the Agency caseworker contacted the Road to Recovery to get a copy of his evaluation. The report was not ready but it was recommended that Father attend outpatient substance abuse treatment. (N.T. 10/18/2019 at pages 27-28 and 8/20/2020 at page 24)

20. Father was informed about the recommendations contained in his drug and alcohol evaluation. Father informed the Agency caseworker that he was going to contact the writer because he had been told that he did not need services. (N.T. 08/20/2020 at page 24)

21. When the Agency received a copy of Father's drug and alcohol evaluation, it was discovered that the recommendations

-7-

for treatment had been erased by the provider. (N.T. 10/18/2019 at pages 27-28 and 8/20/2020 at page 24)

22. Father was charged with his second DUI on February 2, 2020. (N.T. 8/20/2020 at pages 49-50)

23. Father failed to disclose his second DUI charge to the Agency caseworker. (N.T. 8/20/2020 at page 28)

24. Father did not begin to work on his Child's Permanency Plan objectives to achieve reunification with the Child until February of 2020. (N.T. 9/17/2020 at page 24)

25. On March 18, 2020, Father tested positive for alcohol. (N.T. 8/20/2020 at pages 25-26)

26. Father remains in denial that he has issues with alcohol. (N.T. 8/20/2020 at page 28 and 9/17/2020 at pages 18-19)

27. Father underwent a second drug and alcohol evaluation on May 8, 2020. (N.T. 8/20/2020 at page 25)

28. This second evaluation contained recommendations for outpatient drug and alcohol treatment, as well as recommendations for individual and group therapy sessions. (N.T. 6/26/2020 at page 14 and 8/20/2020 at page 25)

29. The Agency requested Father to obtain drug screens on June 9, June 17, 2020, and again on June 29, 2020. Father did not comply. (N.T. 8/20/2020 at page 26)

30. On July 9, 2020, July 14, 2020, July 28, 2020, and August 11, 2020, Father tested positive for marijuana. (N.T. 8/20/2020 at pages 26-27 and page 52)

31. Father does not have a medical marijuana card. (N.T. 8/8/2020 at pages 26-27)

32. Father claims it takes four to six weeks for marijuana to leave his system. (N.T. 8/20/2020 at page 52)

33. Father submitted to a mental health evaluation on August 12, 2020. (N.T. 8/20/2020 at page 23)

34. The provider who conducted Father's mental health evaluation did not have any input from the Agency or anyone else beside Father before writing the report. The evaluation recommended no mental health treatment for Father. (N.T. 8/20/2020 at page 23)

35. As of August 20, 2020, Father was attending individual and group sessions and was compliant. (N.T. 8/20/2020 at page 25).

36. Father had three visits with the Child in the year 2019: one in March of 2019, one on June 13, 2019, and one on June 14, 2019. (N.T. 8/20/2020 at page 30)

37. During the year 2020, Father had four visits with the Child before the COVID-19 pandemic caused in-person visits to cease. Thereafter, Father's sole contact with the resource

-9-

family was by email. (N.T. 8/20/2020 at page 31 and 6/26/2020 at page 47)

38. Father had no virtual visits with the Child during the COVID-19 shutdown, which extended from the middle of March 2020, until sometime in June 2020. (N.T. 8/20/2020 at pages 44-45)

39. Father was offered virtual visits but reported that he did not think the Child would understand the context. (N.T. 8/20/2020 at pages 44-45)

40. Father's in-person visits resumed on June 30, 2020. (N.T. 8/20/2020 at page 31)

41. Father has a total of seven children, including the Child. (N.T. 8/20/2020 at page 59 and 9/17/2020 at page 11)

42. Father's children range in age from six years to twenty-four years. (N.T. 8/20/2020 at pages 59-60)

43. Father's 24 year old lived with Father on and off throughout that child's life. (N.T. 9/17/2020 at pages 11-15)

44. Father's 22 year old son lived with Father on an off throughout that child's life. (N.T. 8/20/2020 at pages 60-61 and 9/17/2020 at pages 11-15)

45. Father lived with his 18 year old son in Georgia for a period of six months when the child was 16 years of age. (N.T. 8/20/2020 at pages 60-61 and 9/17/2020 at pages 11-15)

46. Father lived with his 15 year old son from birth until that child was 8 years of age. When that child was 8 years old,

-10-

Father and the mother of this child had separated. (N.T. 9/17/2020 at pages 11-15)

47. Father lived with his 12 year old daughter from birth until the child was five years of age, at which time Father and the mother of that child separated. That child shares the same mother as Father's 15 year old child. (N.T. 9/17/2020 at pages 11-15)

48. Father has a 6 year old daughter who has never lived with him. (N.T. 9/17/2020 at pages 11-15)

49. Father is in and out of his children's lives because he separates from their mothers. Father claims that his relationships with these women failed but that nevertheless he was a good father to his children. (N.T. 9/17/2020 at page 15)

50. Father claims he is unable to spend additional time with the Child because he has other responsibilities. (N.T. 5/22/2019 at page 22)

51. Father claims he continues to provide for his other children which made it difficult for him to work on his Child's Permanency Plan objectives. (N.T. 9/17/2020 at pages 24-25)

52. The Child has resided in the same resource home since her birth. (N.T. 8/20/2020 at page 32)

53. There are two other children in the resource home, which is a potentially permanent home for the Child. (N.T. 8/20/2020 at page 32)

-11-

54. The Child interacts with the two other children as siblings. The Child and the two other children play, fight over toys, and run and chase each other. (N.T. 8/20/2020 at page 32)

55. The Child looks to the resource parents for comfort, nurturing, and protection. The Child refers to the resource parents at "mommy and daddy." (N.T. 8/20/2020 at page 33)

56. The Child's Guardian *ad litem* supported the termination of both Father and Mother's parental rights. (N.T. 9/17/2020 at page 36)

## CONCLUSIONS OF LAW

1. The Agency proved by clear and convincing evidence that:

(a) Father by conduct continuing for more than a period of six months preceding the filing of the petition, either has evidenced a settled purpose of relinquishing parental claim to the Child or has refused or failed to perform parental duties. [§ 2511 (a).(1)]

2. (a) The repeated and continued incapacity of Father has caused the Child to be without essential parental care, control or subsistence necessary for her physical or mental well-being; and,

(b) the conditions and causes of the incapacity cannot or will not be remedied by Father. [§ 2511 (a)(2)]

-12-

3. The Agency proved by clear and convincing evidence that termination of Father's parental rights will best serve the developmental, physical, and emotional needs and welfare of the Child because the Child is in need of a nurturing, loving and a stable home environment, which Father had failed to provide, and the severance of the bond between the Child and Father will have little impact upon the Child.

## DISCUSSION

In termination of parental rights cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re S.H.*, 879 A.2d 802, 806 (Pa.Super. 2005)

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa.Super. 2003)

In matters involving involuntary termination of parental rights, the appellate standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should

-13-

not be reversed merely because the record would support a different result. *Id.* At [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See in re R.J.T.,* [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)]. *In re T.S.M.,* 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.,* 855 A.2d 68, 73-74 (Pa.Super. 2004)(citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003)(citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa. C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond. *In re L.M.,* 923 A.2d 505, 511 (Pa.Super. 2007)(citations omitted).

-14-

A.   Termination pursuant to 23 Pa. C.S.A. § 2511(a)(1)

There are two pathways to the establishment of the Agency's case under this subsection of the statute. The statute requires the Agency to prove that during a period of more than six months prior to the filing of the Agency's termination of parental rights petition Father demonstrated *EITHER* a settled purpose or intent to relinquish a parental claim *OR* a failure to perform parental duties.

In the instant case, the record supports this court's finding of facts sufficient to determine that Father, by his inaction, followed the second of these pathways to the inescapable conclusion that Father's parental rights should be terminated.

Father learned that he was a parent to the child in the summer of 2018. (Finding of Fact 10.) That condition was conclusively proven through paternity testing, the results of which were known on September 12, 2018. (Finding of Fact 11.)

Measured from the date that Father knew unquestionably that he was a parent to the Child to the date that the Agency's petition was filed (January 22, 2020), a period of more than fifteen months elapsed during which Father did not perform any parental duties toward the Child.

Father was granted a Child's Permanency Plan at the permanency review hearing held before a master on December 19,

-15-

2018. Measured from that date, more than a year elapsed during which Father did very little to address the objectives of his plan.

As the Superior Court has explained: "There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of a child. Thus, this court has held that the parental obligation is a positive duty, which requires affirmative performance...Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life." *In re B., N.M.,* 856 A.2d 847, 855 (Pa.Super. 2004)

For a period of six months preceding the filing of the Agency's petition to terminate parental rights, Father took no affirmative steps to perform parental duties. He made no effort to maintain the parent-child relationship. "Although the six-month period immediately preceding the filing of the petition is most critical to the analysis, the court must consider the whole history of the case and not mechanically apply the six-month statutory provision." *In re K.Z.S.,* 942 A.2d 753, 758 (Pa.Super. 2008) Father took no steps to be a parent from the summer of 2018 and those efforts were spotty at best. Grounds for the

-16-

34

termination of Father's parental rights under § 2511(a)(1) have been proven by clear and convincing evidence.

B.    Termination pursuant to 23 Pa. C.S.A. § 2511(a)(2)

The Agency has the burden to prove three elements under this subsection of the statute: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for [her] physical or mental well-being; and (3) the cause of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted).

Under § 2511 (a)(2) the focus is on the child's present and future need for essential parental care, control, or subsistence necessary for [her] physical or mental well-being. *In re E.A.P.* 944 A.2d 79, 82 (Pa.Super. 2008)(citations omitted and internal quotations omitted).

In the present case, Father never has had physical custody of the Child. He has done little to assert that he was a willing and able parent from the inception of the case. Father has never provided any care for the Child. He has not demonstrated the parental care necessary for the Child's physical and mental well-being to flourish. By his own history of his parenting of his other children as he related it, Father is an "on and off"

-17-

parent. Father's history gives rise to concerns that he would ever be capable of providing for the Child's future needs for essential parental care, control, or subsistence. He only recently began to address the objectives contained in the Child's Permanency Plan, despite the fact that the plan was in place since December 19, 2018. Father's only measurable efforts toward his objectives took place after Father was served with the Agency's petition to terminate his parental rights to the Child. Father's efforts are indubitably too little and too late.

C.  The Child's best interests under 23 Pa. C.S.A. § 2511(b)

The court must next determine whether terminating Father's parental rights to the Child will best serve the developmental, physical and emotional needs and welfare of the Child. *See,* 23 Pa. C.S.A. §2511 (b). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.,* 884 A.2d 1284, 1287 (Pa.Super. 2005) An examination of the parent-child bond is required, where the court must assess the effect upon the child of severing that bond. Expert testimony is not required. *See In re K.K.R.-S.,* 958 A.2d 529, 533 (Pa.Super. 2008)

The Child, who was born on June    2018, is now more than two and half years of age. Father is, for all purposes, a stranger to her. Father's lack of interest was amply demonstrated by his minimal efforts to maintain contact with the

-18-

Child long before the COVID-19 pandemic disrupted in-person visitation. Under these circumstances, it is fully evident that the Child has no bond with Father at all which would be severed by the termination of Father's parental rights.

The Child deserves permanency. The Child deserves a nurturing, loving, and stable home. The Child presently enjoys a home possessing these characteristics with the resource family, which is a potentially permanent resource for her and which is the only family the Child has ever known. There is no doubt that the Child's removal from this home would be highly traumatic and damaging to her psychological and emotional health.

In summary, the Child's best interests are served if she remains with her resource family and is freed to be adopted into that family.

## FATHER'S PROCEDURAL ISSUES

Father, for the first time, raises two issues on appeal.

The first of these issues is stated in Father's Statement of Errors Complained Of On Appeal, at paragraph 3. There, Father states that he "was denied his Fourteenth Amendment Rights to not be deprived of life, liberty, or property without due process of law; nor to be denied the equal protection of law."

This bald assertion does not inform the court with any specificity why Father believes that he was denied his Fourteenth

-19-

Amendment Rights. It leaves the court without a meaningful way to respond.

That said, this court is well aware of the tension between the fundamental right to parent and the fundamental state interest in the protection of children and has been mindful of the strict standards which apply throughout the present proceedings. "Obviously, termination of parental rights is the most extreme infringement of parental rights. Additionally, it is beyond cavil that the protection of children, and in particular the need to provide permanency for dependent children, is a compelling state interest." *In re D.C.D.*, 629 Pa. 325, 349, 105 A.3d 662, 676 (2014).

The second of Father's latently asserted issues is his claim, as stated in Father's Statement of Errors Complained Of On Appeal, at paragraph 4, "Father was denied his right to competent representation by legal counsel because the court did not inform him of his right to counsel prior to every proceeding."

Father's allegation is not supported by the record. In the underlying juvenile dependency case, Father was provided with written notice of his right to counsel and of how to obtain court-appointed counsel when he was served with each of the petitions which brought the case into court from the time to time. Father first appeared in court (albeit by telephone) during the hearing held on December 19, 2018. After an extensive

-20-

colloquy with the master during which Father was advised of his right to counsel and offered to continue the hearing to allow Father to obtain counsel, Father affirmatively waived his right to counsel and asserted his right to proceed as a self-represented party. (N.T. 12/19/2018 at pages 5-6). Father next appeared at the permanency review hearing held before the master on May 22, 2019. Father was again informed of his right to counsel and he indicated his choice to proceed without counsel. (N.T. 5/22/2019 at pages 3-4.) At the next permanency review hearing (also before a master), there was extensive discussion about proceeding with Father's portion of the case at a later date in order to give Father the chance to obtain counsel. Father again waived his right to counsel and elected to proceed. (N.T. 10/18/2019 at pages 6-10). Father was represented by counsel at the permanency review hearing held before the master on June 26, 2020, and at both sessions of the hearing on the Agency's termination of parental rights petition.

In summary, in the event that the Superior Court elects to address Father's two issues raised for the first time on appeal, the record amply supports the conclusion that these issues should be resolved against Father.

-21-

## CONCLUSION

The issues raised by Father in his appeal lack merit. The Decree entered on November 24, 2020, should be affirmed.

BY THE COURT:

_____
JEFFREY J. REICH, JUDGE

Dated: January 22, 2021

Attest: _____
DEPUTY CLERK-OCD

Copies to:

NOTICE OF ENTRY OF ORDER OR DECREE
PURSUANT TO PA O.C. RULE 4.6.
NOTIFICATION: THE ATTACHED DOCUMENT
HAS BEEN FILED IN THIS CASE
WITH THE ORPHANS' COURT OF LANCASTER COUNTY, PA.
DATE: 1-22-2021

Catharine I. Roland, Esquire
110 East King Street
Lancaster PA  17602

    Counsel for Father

Gina Carnes, Esquire
P.O. Box 742
Hummelstown PA  17036

    Guardian *ad litem*

Tamara E. Hogan, Esquire
Lancaster County Children and Youth Social Service Agency
150 North Queen Street, Suite 777
Lancaster PA  17603

    Counsel for the Agency

-22-